UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORNELL J. MORROW,

             Petitioner,

    v.

GARY SWARTHOUT, Warden

             Respondent.

Case No.  11-6308 JST (PR)


**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

      Before the Court is the above-titled <u>pro se</u> petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by Petitioner Cornell J. Morrow, challenging the validity of a judgment obtained against him in the Alameda County Superior Court.  Respondent filed an answer to the petition.  Petitioner has filed a traverse.  For the reasons discussed below, the petition is DENIED as to all claims and a certificate of appealability is DENIED.

<div align="center">

**PROCEDURAL HISTORY**

</div>

      In January 2009, an Alameda County jury found Petitioner guilty of aggravated assault and murder.  Respondent's Ex. 1, Clerk's Transcript (CT) at 370-371.  In February 2009, in a separate bench trial, the court found ten prior convictions and related enhancements to be true.  CT at 374-79.  On February 25, 2009, the court sentenced Petitioner to eighty-six years to life in prison.  CT at 397-99.

      Petitioner, who was then represented by counsel, appealed and, on August 31, 2010, the Court of Appeal modified certain fines and fees imposed by the trial court, but otherwise affirmed the judgment.  Respondent's Ex. 8, <u>People v. Morrow</u>, 2010 WL 3410896 (Cal. Ct. App. Aug. 31, 2010) (unpublished).   On October 4, 2010, Petitioner, represented by counsel, filed a petition for review in the California Supreme Court.

<div style="writing-mode: vertical-rl">United States District Court
Northern District of California</div>

Respondent's Ex. 9.  Petitioner also filed a petition for a writ of habeas corpus in the California Court of Appeal.  On May 13, 2010, this petition was summarily denied.  Respondent's Ex. 12.  On August 31, 2010, Petitioner filed a pro se petition for habeas review in the California Supreme Court.  Respondent's Ex. 10.  On December 1, 2010, the California Supreme Court summarily denied both petitions for review.  Respondent's Ex. 11.

On December 14, 2011, Petitioner filed the instant petition for a writ of habeas corpus.  The matter is now fully briefed and is ready for review on the merits.

## STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[1]

### A. The Attack on Muhammad Asif

In August 2006, Muhammad Asif was waiting in line in his container truck at the Maersk Terminal at the Port of Oakland.  He saw Morrow approach on foot from behind his truck.  Morrow was angry and seemed to believe Asif had cut in front of him in line.  Morrow told Asif to come down out of his truck, then punched him in the face and knocked him down.  When Asif tried to get up, Morrow hit him again.

Asif suffered four fractures to the left side of his face, and later underwent surgery to install titanium plates in his head.  FN1  The surgeon testified that a large amount of force was required to cause Asif's injuries, which were more commonly seen as the result of a car accident or sports injury than a punch to the face.  Asif identified Morrow in a photo lineup as his assailant.

FN1:  Even after the surgery, Asif suffered from pain, swelling, and numbness in his face.

A watchman at the Port saw a younger man, whom he later identified as Morrow, get out of his truck further back in line and walk toward the truck of an older man, who was a regular trucker at the Port.  FN2  The watchman testified that the younger man yelled at the older man, and hit him three or four times in the face with a closed fist. The older man never hit back.

---

[1] This summary is presumed correct.  See Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

FN2:  The watchman testified the older man looked about 60 years old, and the younger man about 30.  Asif was 54 years old at the time of the assault, while Morrow was in his late 30's.

Another watchman/security guard responded to the scene of the incident, where he saw a truck driver leaning against his truck, bleeding from his nose, while another truck driver was walking back to his vehicle.  FN3  The security guard took down the license plates of both men, and provided the information to his supervisor and to the police.  The injured man called the police, and the security guard told both men to wait for the police to arrive, but the assailant drove away.  Police determined that the license plate recorded by Port employees belonged to a truck owned by Morrow. Morrow was arrested and charged with assault by means of force likely to cause great bodily injury in September 2006.  He posted bail the following month, and was released from custody.

FN3:  The supervisor recognized the man who was bleeding, and said he had a history of cutting in front of other drivers in line.

**B. The Killing of Janet Alston**

At approximately 5:30 a.m. on August 14, 2007, a deputy sheriff on duty at Highland Hospital was told there was a woman's body outside on the ground.  He investigated and saw Morrow standing over it.  The woman had fractured ribs and facial bones, bruising all over her body, and no heartbeat or brain activity.  She was resuscitated and placed on life support.  When she continued to show no signs of brain activity, life support was discontinued, and she died.  The cause of death was multiple blunt force trauma that caused her brain to fail.  The doctor who performed the autopsy determined that Alston was alive when she was injured, and most of the bruises (and the brain injuries) were inflicted within three days of her death.

The deputy who found Alston's body spoke with Morrow, who claimed he just left his aunt's house and found the body on the ground.  Morrow did not say he knew the victim, nor did he tell the deputy her name.  Since he saw no marks on Morrow's face or hands that would indicate Morrow was in a physical altercation, the deputy allowed him to leave for work after obtaining his contact information. FN4

FN4:  The deputy later reviewed surveillance footage that showed a car pull up to the hospital at 5:22 a.m., park, and then leave.  An Oakland police officer also spoke with Morrow by phone at 5:39 a.m. that morning.  Morrow told the officer he discovered the victim's body and flagged down a nurse for help.  Morrow declined to give a formal statement at the police station and said he was busy working.

After word of Alston's death appeared in the news, Oakland police received a phone call from Monroe Oakley.  Oakley knew Morrow and also knew Alston as Morrow's girlfriend.  He had seen them together several times.  At about 4:00 a.m. on August 14, while he was on his way home from drinking with friends, Oakley heard two people arguing near Morrow's parked car.  Oakley saw Morrow pull Alston out of the passenger side of the car by her hair, and beat her with his fists.

FN5  Morrow appeared to be very angry and was swearing at Alston, who pleaded with him to stop beating her.  Oakley saw that Alston was bleeding from her nose, and he told Morrow to stop.  Morrow said, "I wish someone would try to help you," and Oakley was afraid Morrow would turn on him.

FN5:  Oakley also told police that Morrow said something about Alston sleeping with somebody, but he did not remember the details at the time of trial.

When Alston went to the side of the car, sobbing, Morrow took off his jacket and started beating her again "with wild swings" as she crouched down by the side of the car.  Morrow hit her so many times it was hard to count, then dragged her back to the car, saying, "[g]et your butt up and get in this car."  By then, Alston appeared to be totally unconscious.  Morrow picked her up, placed her in his car, and drove away.  Oakley identified Morrow in a photo lineup.  Oakley said he felt responsible for not doing more to help Alston, and did not receive any money or other assistance from law enforcement or the district attorney's office in exchange for assisting police or testifying at trial.

About 10 days after her body was found outside the hospital, police spoke with Morrow and he confirmed that he lived with Alston.  Blood found in several areas of Morrow's car was determined to come from a single female individual whose DNA profile matched Alston's.  Police also took photos that showed injuries on Morrow's knuckles, thumb, palm and forearm.

Terry Schamma testified he became acquainted with Morrow when they were both in county jail, and they communicated through their cell doors and through a vent between their cells.  FN6  Morrow told Schamma he was accused of murdering his girlfriend, and initially claimed that someone else committed the murder.  Morrow also said Alston died while she was trying to get out of a moving car.  But when Morrow showed Schamma the autopsy report, he told Morrow her injuries could not have been caused that way, and "[t]his woman was beaten down."  Morrow broke down and cried, and ultimately admitted to Schamma that he "beat [the victim] down" because it drove him crazy that he could not control her.  Morrow also admitted that he drove the victim to the hospital and pretended he did not know her.  FN7

FN6:  Schamma had been convicted for auto theft in 2008, making criminal threats in 2000, being a felon in possession of a firearm in 1999, and assault with a deadly weapon in 1996.

FN7  Morrow told Schamma he "fucked up" when he denied knowing Alston.

When Morrow learned that Schamma would be released from custody, he told Schamma it would be "beneficial to [Schamma] if [he] could help [Morrow] get [Oakley] to disappear," and directed Schamma to a neighborhood where he could find Oakley.  Schamma reported Morrow's statements to a police officer with whom he had a prior relationship as an informant.  Schamma said he did not receive any promises or money for his testimony (although he had been paid in the past for

United States District Court
Northern District of California

1    information he provided to police), and that he was testifying because "it was the
2    right thing to do."

     Morrow, 2010 WL 3410896, at *1-3.

3                                    **DISCUSSION**

4    **I.    Standard of Review**

5            This Court may entertain a petition for a writ of habeas corpus "in behalf of a
6    person in custody pursuant to the judgment of a State court only on the ground that he is in
7    custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.
8    § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

9            A district court may not grant a petition challenging a state conviction or sentence
10   on the basis of a claim that was reviewed on the merits in state court unless the state
11   court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or
12   involved an unreasonable application of, clearly established Federal law, as determined by
13   the Supreme Court of the United States; or (2) resulted in a decision that was based on an
14   unreasonable determination of the facts in light of the evidence presented in the State court
15   proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).
16   Additionally, habeas relief is warranted only if the constitutional error at issue had a
17   "substantial and injurious effect or influence in determining the jury's verdict."  Penry v.
18   Johnson, 532 U.S. 782, 795 (2001) (citing Brecht v. Abrahamson, 507 U.S. 619, 637
19   (1993)).

20           A state court decision is "contrary to" clearly established Supreme Court precedent
21   if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's]
22   cases," or if it "confronts a set of facts that are materially indistinguishable from a decision
23   of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."
24   Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal
25   habeas court may grant the writ if the state court identifies the correct governing legal
26   principle from [the Supreme] Court's decisions but unreasonably applies that principle to
27   the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the
28   writ simply because that court concludes in its independent judgment that the relevant

United States District Court
Northern District of California

5

state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.   In other words, federal habeas relief is available only if the state court's application of federal law is "so erroneous that 'there is no possibility fair minded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" Nevada v. Jackson, __ U.S. __, 133 S. Ct. 1990, 1992 (2013) (citing Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 786 (2011)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

The standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim.  In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable.  Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006);  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002).  When confronted with such a decision, a federal court should conduct an "independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at 1198; Himes, 336 F.3d at 853.

Here, as noted, the California Supreme Court summarily denied Petitioner's petitions for review.  The Court of Appeal, in its opinion on direct review, addressed the only federal claim that Petitioner raised on direct appeal--that the state court's consolidation of the murder case with the assault case deprived him of due process.  See Respondent's Ex. 5.  Thus, the Court of Appeal was the highest state court to have

reviewed this claim in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews.  Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  Petitioner presented a Miranda claim and other claims to the California Supreme Court in his pro se habeas petition.  The Supreme Court summarily denied these claims.  Petitioner's Miranda claim was decided by the trial court after an evidentiary hearing.  The Court reviews the trial court's decision as the last reasoned state court decision on the Miranda claim.  Because there is no reasoned state decision on the other claims Petitioner presented in his state habeas petition, the Court independently reviews them to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law.  Several claims Petitioner presents in his federal petition are unexhausted.  For the reasons discussed below, they are denied on their merits.  See 28 U.S.C. § 2254; Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005) (on habeas review of an unexhausted claim, court may not grant it, but may deny it if it is clear that the claim is not colorable).

## II.  Petitioner's Claims

Petitioner asserts the following grounds for relief: (1) violation of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966); (2) invalid enhancement of his sentence with an unconstitutional prior conviction; (3) ineffective assistance of trial and appellate counsel; (4) prosecutorial misconduct; and (5) due process violation based on the consolidation of his assault case with his murder case.  In his traverse, Petitioner requests an evidentiary hearing. The Court addresses each claim in turn.

### A.  Miranda Claim

Petitioner asserts that his Miranda rights were violated because, when the police were interrogating him regarding the Alston murder, he told them that "his family had advised him to speak only with his lawyer," but the police improperly continued with their interrogation. Petition at 2.  He argues that the police also violated his Miranda rights by surreptitiously tape recording his conversation with them in a police car on the way back to the county jail.  Petition at 2-3.

1    Because the state trial court's adjudication of this claim is the last reasoned state

2    court decision on this issue, this Court reviews it to determine if it was an objectively

3    unreasonable application of Supreme Court authority or an unreasonable determination of

4    the facts in light of the evidence.  See Ylst, 501 U.S. at 803-04.

5    **1. Trial Court Proceedings**

6    Before the trial, the prosecution filed a motion in limine to admit Petitioner's

7    statement to Oakland Police Sergeants Caesar Basa and Lou Cruz which they

8    surreptitiously recorded while they were driving Petitioner back to country jail in a patrol

9    car.  The defense objected on Miranda grounds, arguing that Petitioner never waived his

10   Miranda rights because he did not sign the waiver form.   CT at 203 (Defense opposition to

11   motion in limine).

12   The court held a pre-trial hearing on the Miranda issue.  Reporter's Transcript (RT)

13   at 98-129.  Sgt. Basa, the primary investigator of the homicide of Janet Alston, testified to

14   the following.  RT at 99.  On August 26, 2007, Sgt. Basa and his partner, Sgt. Cruz,

15   interviewed Petitioner, for approximately two hours, in an interview room at the Oakland

16   police department.  RT at 100-02.  Sgt. Basa had interviewed Petitioner several months

17   previously on an unrelated charge.  RT at 104-05.  Petitioner recognized Sgt. Basa from

18   the previous interview.  RT at 110-11.  Petitioner mentioned that, even though he thought

19   Sgt. Basa had been fair in that interview, he still got charged with the crime.  RT at 112.

20   In the August 26 interview, Sgt. Basa filled out a standard Oakland police

21   department form with Petitioner's identifying information.  RT at 106.  Sgt. Basa then read

22   to Petitioner his Miranda rights and asked if Petitioner understood them.  RT at 106-07.

23   Petitioner responded, "Yes."  RT at 107.  Sgt. Basa documented Petitioner's response by

24   writing the word, "Yes," in quotes next to that question.  RT at 107.  Sgt. Basa then asked

25   Petitioner if, having those rights in mind, he wished to speak to the detectives.  RT at 107.

26   Petitioner responded, "Yes," and Sgt. Basa again wrote the word, "Yes," in quotes next to

27   the question.  RT at 107.  Petitioner refused to put his initials in the right hand column next

28   to each question to acknowledge that he had replied, "Yes," to each of them.  RT at 107-

United States District Court
Northern District of California

8

08.  However, Petitioner did not indicate an unwillingness to speak to Sgt. Basa and Sgt. Cruz.  RT at 108.

After Petitioner waived his rights, the sergeants proceeded to ask him questions. RT at 108.  Sgt. Basa did not take notes during this interview.  RT at 109.  During the time the sergeants were asking questions, Petitioner never asked them to stop.  RT at 109. Petitioner never invoked his <u>Miranda</u> rights during that interview or at any time Sgt. Basa was with him that day.  RT at 109.  Sgt. Basa did not coerce Petitioner to speak during the interview nor was he aware of anyone who coerced Petitioner to speak or made any promises to Petitioner in order to get him to speak.  RT at 109-10.

Even though it was common practice to take a formal taped statement from a person after they give an untaped statement, the sergeants did not take a formal statement from Petitioner because they believed that, "had we done so, that Mr. Morrow would completely not talk to us or would not say anything."  RT at 110.  Sgt. Basa said the reason for this was that Petitioner "showed a sign of being hesitant to begin with, not signing . . . his response to the <u>Miranda</u>; and also having dealt with him in the past, him bringing it up, I felt like [if we] had pushed the issue of bringing the tape out, he would completely shut down."  RT at 110-12.

The sergeants transported Petitioner back to Santa Rita County jail at approximately 3:30 pm, about one half hour after the interview ended.  RT at 113.  The sergeants decided that they would surreptitiously tape Petitioner in the police car on the way back to the jail. RT at 113.  During the ride back, Sgt. Basa commented to Petitioner about his willingness to speak to him and Sgt. Cruz at the police station but that he had been unwilling to sign the paper indicating that he was willing to speak.  RT at 114.  Petitioner never denied that he was willing to speak but unwilling to sign the document.  RT at 114.

On cross-examination, Sgt. Basa testified that, in the police car, he did not give Petitioner new <u>Miranda</u> admonitions because he was under the impression that Petitioner had waived these rights in the police interview room.  RT at 117.

During argument on the in limine motion, the prosecutor acknowledged that

9

Petitioner was in custody and was interrogated by the sergeants at the police station and in the police car. RT at 136-37. The prosecutor argued that the officers had read Petitioner his <u>Miranda</u> rights, that Petitioner had waived those rights knowingly, voluntarily and intelligently. RT at 137. Defense counsel argued that Petitioner never waived his <u>Miranda</u> rights during the interview at the police station because, if he had, the detectives would have mentioned this on the tape in the police car, corroborating his waiver. RT at 144. Counsel argued that the fact that Petitioner did not initial or sign the waiver form was strong evidence that he had not waived his rights. RT at 144. Counsel argued that further evidence of Petitioner's lack of waiver was the fact that the detectives felt they had to surreptitiously record the interrogation in the car. RT at 144-45.

After additional argument by the attorneys, the court ruled, "I have read and reviewed each of the cases recited by both parties, and based on the totality of the circumstances, it appears that there was a voluntary and intelligent waiver at the outset, and that the defendant voluntarily provided a statement to the officers and merely refused to sign the form. Therefore, the statements that were provided during the interview, both in the CID (police interrogation) room as well as in the Patrol Unit, will be found and are found admissible." RT at 189.

## 2. Federal Authority

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during a custodial interrogation can be admitted in evidence. The requirements of <u>Miranda</u> are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d). <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1271 (9th Cir. 2005); <u>Jackson v. Giurbino</u>, 364 F.3d 1002, 1009 (9th Cir. 2004).

<u>Miranda</u> requires that a person subjected to custodial interrogation be advised that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." <u>Miranda</u>, 384 U.S. at 444. The warnings must precede any custodial interrogation, which occurs whenever law

10

United States District Court
Northern District of California

1   enforcement officers question a person after taking that person into custody or otherwise

2   significantly deprive a person of freedom of action.  Id.

3          Once properly advised of his rights, an accused may waive them voluntarily,

4   knowingly and intelligently.  Id. at 475.  The distinction between a claim that a Miranda

5   waiver was not voluntary, and a claim that such waiver was not knowing and intelligent is

6   important.  Cox v. Del Papa, 542 F.3d 669, 675 (9th Cir. 2008).  The voluntariness

7   component turns on the absence of police overreaching, i.e., external factors, whereas the

8   cognitive component depends upon the defendant's mental capacity.  Id.

9          A valid waiver of Miranda rights depends upon the totality of the circumstances,

10  including the background, experience and conduct of the defendant.   Colorado v.

11  Connelly, 479 U.S. 157, 168-69 (1986); Lego v. Twomey, 404 U.S. 477, 488-89 (1972);

12  Terrovona v. Kincheloe, 912 F.2d 1176, 1180 (9th Cir. 1990).  The waiver need not be

13  express as long as the totality of the circumstances indicates that the waiver was knowing

14  and voluntary.  North Carolina v. Butler, 441 U.S. 369, 373 (1979); Juan H., 408 F.3d at

15  1271.  "Where the prosecution shows that a Miranda warning was given and that it was

16  understood by the accused, an accused's uncoerced statement establishes an implied

17  waiver of the right to remain silent."  Berghuis v. Thompkins, 560 U.S. ___, 130 S. Ct.

18  2250, 2261-62 (2010).  The law presumes that an individual who fully understands their

19  rights and acts in a manner inconsistent with them has made "a deliberate choice to

20  relinquish the protection those rights afford."  Id. at 2262 (citations omitted).  A showing

21  that the defendant knew his rights generally is sufficient to establish that he knowingly and

22  intelligently waived them.  Id. at 2260-61.  "[I]f a suspect makes a reference to an attorney

23  that is ambiguous or equivocal in that a reasonable officer in light of the circumstances

24  would have understood only that the suspect might be invoking the right to counsel,"

25  questioning need not cease.  Davis v. United States, 512 U.S. 452, 459 (1994).  "Rather,

26  the suspect must unambiguously request counsel."  Id. at 459-62 ("Maybe I should talk to a

27  lawyer" insufficient); Sechrest v. Ignacio, 549 F.3d 789, 807 (9th Cir. 2008) (suspect's

28  mention of an attorney and reference to advice from attorney that suspect "keep his mouth

11

1  shut" was not unambiguous request for counsel); United States v. Younger, 398 F.3d 1179,

2  1187 (9th Cir. 2005) (defendant's statement "[b]ut, excuse me, if I am right, I can have a

3  lawyer present through all this, right?"does not constitute unambiguous invocation of right

4  to counsel).

5          Whether a statement is voluntarily made may depend upon whether there has been a

6  lapse of time and/or change in questioners between the Miranda warning and the

7  incriminating statement.  Courts generally reject a per se rule as to when a suspect must be

8  readvised of his rights after the passage of time or a change in questioners.  United States

9  v. Andaverde, 64 F.3d 1305, 1311 (9th Cir. 1995).  Rather, the totality of circumstances

10 should be considered in each individual case.  See id. at 1311-12 (finding (1) voluntary

11 waiver even though defendant moved into different room and questioned by new

12 interrogator, and (2) one day interval between voluntary waiver and second questioning

13 not unreasonable).

14                         **3. Analysis**

15         Petitioner argues that his Miranda rights were violated because, in the interview

16 room, he told the detectives that Petitioner's "family had advised him to speak only with

17 his lawyer."  Petition at 2.  However, this fact was not presented to the trial court at the

18 time it decided the Miranda issue.  Therefore, it cannot be considered on federal habeas

19 review.  See Holland v. Jackson, 542 U.S. 649, 652 (2004) ("whether a state court's

20 decision was unreasonable must be assessed in light of the record the [state] court had

21 before it.");  Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388, 1400 (2011) (holding that

22 evidence introduced in federal court has no bearing on whether the state court's ruling was

23 contrary to or an unreasonable application of federal authority; the federal claim must be

24 adjudicated on the record that was before the state court).  Further, even if Petitioner had

25 made such a statement, it would not have been an unambiguous request for counsel that

26 would require questioning to cease.  See Davis, 512 U.S. at 459; Sechrest, 549 F.3d at 807.

27         In finding that Sgt. Basa read Petitioner his Miranda rights in the Oakland police

28 department interrogation room, the trial court reasonably relied upon Sgt. Basa's

United States District Court
Northern District of California

12

testimony, the <u>Miranda</u> waiver form indicating that Petitioner was read his rights and verbally waived them and the tape recording of the interview in the patrol car in which Petitioner did not deny Sgt. Basa's observation that Petitioner had verbally waived his rights, but would not sign the form.  The trial court's conclusion that Petitioner's refusal to sign the <u>Miranda</u> form did not negate his verbal waiver was not contrary to or an unreasonable application of established Supreme Court authority.  <u>See</u> <u>e.g.</u>, <u>Butler</u>, 441 U.S. at 373 (although express written or oral statement of waiver of <u>Miranda</u> rights is strong proof of valid waiver, it is not necessary; waiver can be inferred from the actions and words of the person interrogated).  Here, Petitioner had previous experience with the criminal justice system and, thus, knew his <u>Miranda</u> rights, and the taped interview in which Petitioner did not negate Sgt. Basa's statement that he had verbally waived his <u>Miranda</u> rights but refused to sign the waiver form was strong evidence that Petitioner had been given his rights and had waived them.  Thus, the trial court's conclusion that Petitioner knowingly and intelligently waived his <u>Miranda</u> rights was not so lacking in justification that there was an error well understood in existing law beyond any possibility for fair-minded disagreement.  <u>Harrington</u>, 131 S. Ct. at 786-87.

Furthermore, the trial court reasonably concluded that it was not necessary for the sergeants to re-<u>Mirandize</u> Petitioner before they questioned him on the ride back to the county jail because that drive took place less than one hour after the end of the interview at the police station.  <u>See</u> <u>Andaverde</u>, 64 F.3d at 1311 (one-day interval between waiver of <u>Miranda</u> rights and second interrogation not unreasonable).

Accordingly, Petitioner's <u>Miranda</u> claim is denied.

**B. Prior Strike Conviction**

Petitioner contends that the trial court improperly enhanced his sentence with invalid prior strike convictions from 1992.  Petition at 12-14.  He argues that he agreed to a plea bargain in the 1992 case which stated that if he was arrested and convicted of a serious or violent felony in the future, he could only receive a five-year enhancement.  Petition at 13.  Petitioner argues that the plea agreement contract was breached in this case

13

1    because he received more than a five-year enhancement.  He also argues that the 1992

2    sentence was invalid because that court enhanced his sentence with two prior convictions

3    that do not exist.  Traverse at 17.  Petitioner presented this claim in his <u>pro se</u> petition to

4    the California Supreme Court, which summarily denied it.

5            A petitioner generally may not attack the constitutionality of a prior conviction used

6    to enhance a later sentence.  "[O]nce a state conviction is no longer open to direct or

7    collateral attack in its own right because the defendant failed to pursue those remedies

8    while they were available (or because the defendant did so unsuccessfully), the conviction

9    may be regarded as conclusively valid.  If that conviction is later used to enhance a

10   criminal sentence, the defendant generally may not challenge the enhanced sentence

11   through a petition under § 2254 on the ground that the prior conviction was

12   unconstitutionally obtained."  <u>Lackawanna County Dist. Attorney v. Coss</u>, 532 U.S. 394,

13   403-04 (2001) (citation omitted).  The only exception to the rule barring challenges to

14   prior convictions used to enhance current sentences is that a petitioner may challenge a

15   prior conviction on the ground that there was a failure to appoint counsel in that case in

16   violation of the Sixth Amendment.  <u>Id.</u> at 404.  Petitioner does not argue that he was not

17   represented by counsel in his 1992 case.  Therefore, he cannot attack the constitutionality

18   of the 1992 convictions in this habeas proceeding.

19           Even if he could attack them, his claim fails on the merits.  Petitioner

20   mischaracterizes the plea agreement he entered into in the 1992 case.  Although he does

21   not submit the agreement itself, he submits the transcript of the 1992 sentencing hearing.

22   Traverse, Ex. E at 11-12.  The transcript indicates that Petitioner admitted to two priors and

23   the district attorney agreed that they would be treated as one prior and that it might

24   enhance Petitioner's sentence by only five years.  <u>Id.</u> at 11.   Nothing in the transcript

25   indicates an agreement to limit enhancements of future criminal sentences to only five

26   years.  Thus, Petitioner's own evidence does not support his theory that his 1992 plea

27   agreement allowed his sentence in this case to be enhanced by only five years.

28   Furthermore, the 1992 convictions would not be invalidated even if the convictions used to

United States District Court
Northern District of California

14

1    enhance the 1992 sentence "did not exist."

2            Accordingly, this claim is without merit and is denied.

3        **C. Ineffective Assistance of Trial Counsel**

4            **1. Federal Law**

5            The Sixth Amendment to the United States Constitution guarantees a defendant the

6    right to effective assistance of counsel in a criminal prosecution.  McMann v. Richardson,

7    397 U.S. 759, 771, n.14 (1970).   In Strickland v. Washington, 466 U.S. 668 (1984), the

8    United States Supreme Court set forth the standard, a two-pronged test, for evaluating

9    claims for ineffective assistance of counsel.  First, the petitioner must establish that

10   counsel's performance was deficient, i.e., that it fell below an "objective standard of

11   reasonableness" under prevailing professional norms, id. at 687–88, "not whether it

12   deviated from best practices or most common custom," Harrington, 131 S. Ct. at 788

13   (citing Strickland, 466 U.S. at 690).   Judicial scrutiny of counsel's performance must be

14   highly deferential: "[a] court considering a claim of ineffective assistance must apply a

15   'strong presumption' that counsel's representation was within the 'wide range' of

16   reasonable professional assistance." Id. at 787 (quoting Strickland, 466 U.S. at 689).

17   When considering an ineffective assistance claim in a habeas case, federal courts must

18   apply a "doubly" deferential standard.  Cullen v. Pinholster, 131 S. Ct. 1388, 1410-11

19   (2011); Harrington, 131 S. Ct. at 788 (same); Premo v. Moore, 131 S. Ct. 733, 740 (2011)

20   (same).  When § 2254(d) applies, "the question is not whether counsel's actions were

21   reasonable.  The question is whether there is any reasonable argument that counsel

22   satisfied Strickland's deferential standard." Harrington, 131 S. Ct. at 788.  A difference of

23   opinion as to trial tactics does not constitute denial of effective assistance, United States v.

24   Mayo, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective

25   assistance simply because in retrospect better tactics are known to have been available.

26   Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984).  Counsel's performance cannot be

27   deemed deficient for failing to make a meritless objection or failing to take a futile action.

28   Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) ; Rupe v. Wood, 93 F.3d 1434, 1445

United States District Court
Northern District of California

15

1   (9th Cir. 1996) (failure to take a futile action can never be deficient performance).

2       <u>Strickland</u>'s second prong requires a showing "that counsel's errors were so serious

3   as to deprive [petitioner] of a fair trial, a trial whose result is reliable."  <u>Strickland</u>, 466

4   U.S. at 687.  To establish prejudice under <u>Strickland</u>, a petitioner "must show that there is

5   a reasonable probability that, but for counsel's unprofessional errors, the result of the

6   proceeding would have been different.  A reasonable probability is a probability sufficient

7   to undermine confidence in the outcome." <u>Id.</u> at 694-95.  If a petitioner cannot establish

8   that defense counsel's performance was deficient, it is unnecessary for a federal court

9   considering a habeas ineffective assistance claim to address the prejudice prong of the

10  <u>Strickland</u> test.  <u>Siripongs v. Calderon</u>, 133 F.3d 732, 737 (9th Cir. 1998).

                                    **2. Analysis**

12      Petitioner argues that trial counsel was ineffective for failing to: (1) request that the

13  trial court admit into evidence a citizen crime report Petitioner filled out against Mr. Asif;

14  (2) communicate with him effectively without being verbally abusive; (3) investigate

15  certain issues Petitioner suggested; (4) allow Petitioner to testify in his own defense; and

16  (5) conduct an investigation into the <u>Miranda</u> issue and prepare for the <u>Miranda</u> hearing.

17  Only the first of these claims is exhausted.

                           **a. Petitioner's Police Report**

19      Petitioner included his first claim in his <u>pro se</u> petition to the California Supreme

20  Court.  Because there is no reasoned state court decision on this claim, this Court

21  independently reviews the record to determine if the state court's denial of it was contrary

22  to or an unreasonable application of Supreme Court authority.

23      Petitioner argues that Mr. Asif was a known bully and had a reputation for cutting

24  off other drivers and that, on the day of the assault incident, Mr. Asif cut Petitioner off .

25  Petitioner then got out of his rig to discuss this matter with Mr. Asif.  Petition at 5.   As

26  Petitioner approached, Mr. Asif got out of his truck, Petitioner and Mr. Asif "squared off,"

27  and blows were exchanged.  Petition at 6.  A Port of Oakland Authority private security

28  employee asked both parties not to leave.  Petitioner argues that the private security guard

United States District Court
Northern District of California

had no authority to order him to stay and he wanted to report the incident to legitimate law enforcement personnel.  Petitioner left the scene and, because of this, the trial court gave a consciousness of guilt instruction to the jury.  Petitioner contends that his citizen's crime report, in which he stated that Mr. Asif "rushed at me with his hands moving towards my neck.  I feared he had intentions to harm me . . . I protected myself by landing two blows (fist), one to his stomach, the other to the face.  The attack mode that he was in then stopped," would have shown that he did not leave the scene out of consciousness of guilt, but to report Mr. Asif's crime to legitimate law enforcement.  Petition, Ex. C.

As pointed out by Respondent, the "citizen's crime report" contains an admission by Petitioner that he hit Mr. Asif twice with his fist, once in the face and once in the stomach.  Thus, counsel would have good reason for deciding not to have the jury see it.  Further, Petitioner's poor opinion of private security does not negate the fact that he left the scene after being requested to stay so the situation could be investigated.  If Petitioner had stayed at the scene, he could have told his version of events to the police officer who arrived after Petitioner left.  Petitioner does not explain why he had to file the police report at a police station instead of waiting for the police to arrive at the Port of Oakland.

For all these reasons, Petitioner's theory that his citizen's police report would have eliminated the consciousness of guilty jury instruction is not credible.  Therefore, his argument that counsel's performance was deficient for failing to put this report into evidence is without merit.  After independently reviewing the record, this Court finds that the state court's denial of this claim was not objectively unreasonable.

### b. Failure to Communicate

Petitioner's next claim, that counsel was ineffective because she failed to communicate with him and was overly assertive or aggressive in her manner, lacks merit.  As evidence, Petitioner submits a letter to him from counsel apologizing for yelling at him.  Traverse, Ex. A.  In the letter, in addition to apologizing, counsel informed Petitioner that: (1) she was hiring an investigator to work on his case; (2) he should not to talk to anyone about his case except the investigator and herself; (3) Petitioner could write to her anytime;

(4) she wanted to visit him and would visit as soon as she could but, at present, she could not visit because she was involved with another trial that took all of her attention; (5) she was sending him the police report; (6) she was turning police interviews that were on CDs into audio tapes so that Petitioner could listen to them; and (7) she wanted him to participate in his case. She also discussed various suggestions Petitioner had given her and indicated how they could help or hinder his case.

This letter, rather than supporting Petitioner's argument that counsel did not communicate or consult with him, shows the opposite. It shows that counsel was aware that she had yelled at Petitioner, apologized for it and wanted to develop a constructive relationship with Petitioner. The letter also shows that counsel seriously considered Petitioner's suggestions regarding investigating certain aspects of his case, and wanted to keep an open line of communication between them. The Supreme Court has held that, although the Sixth Amendment guarantees the right to competent counsel, it does not guarantee a meaningful relationship between an accused and his counsel. Morris v. Slappy, 461 U.S. 1, 13-14 (1983). Therefore, Petitioner has failed to present a colorable claim of ineffective assistance of counsel based on counsel's failure to communicate.

### c. Failure to Investigate

Petitioner argues that counsel was ineffective for failing to investigate issues Petitioner suggested to her.

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Strickland, 466 U.S. at 691; Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011); Turner v. Duncan, 158 F.3d 449, 456 (9th Cir. 1998). Strickland directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 491). Counsel need not pursue an investigation that would be fruitless or might be harmful to the defense. Harrington, 131 S. Ct. at 789-90. The duty to investigate and prepare a defense does not require that every

United States District Court
Northern District of California

United States District Court
Northern District of California

1    conceivable witness be interviewed.  Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir.

2    1995).  A claim of failure to interview a witness cannot establish ineffective assistance

3    when the person's account is otherwise fairly known to defense counsel.  Eggleston v.

4    United States, 798 F.2d 374, 376 (9th Cir. 1986).  A defendant's mere speculation that a

5    witness might have given helpful information if interviewed is not enough to establish

6    ineffective assistance.  Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253

7    F.3d 1150 (9th Cir. 2001).

8           Petitioner states that counsel did not investigate Officer Peterson, who took Mr.

9    Asif's statement at the scene of the assault.  Traverse at 11, Ex. B at 3-4.  Petitioner argues

10   that Officer Peterson's testimony would have shown that Mr. Asif made a false police

11   report.  However, Officer Peterson's report indicates that he was responding to a call that

12   two truckers had been involved in a physical fight and that, when he arrived, he took down

13   Mr. Asif's statement.  Because Officer Peterson did not witness the fight but only took

14   down Mr. Asif's statement, he could not have testified that Mr. Asif's statement was

15   incorrect.  Furthermore, the prosecutor questioned Mr. Asif about the discrepancy in his

16   police report and his testimony.  RT at 302-04 .  Mr. Asif admitted that he did not give a

17   true statement to Officer Peterson about when or why he got out of his truck.  RT at 304.

18   Therefore, an investigation of Officer Peterson would not have aided Petitioner's defense.

19          Petitioner argues that counsel should have investigated the background of jailhouse

20   informant Terry Schamma who testified against Petitioner.  Petitioner argues that a simple

21   investigation into Mr. Schamma's background would have shown that he was a liar and a

22   jailhouse informant for hire.  Traverse at 15.  However, during cross-examination, Mr.

23   Schamma admitted that he had been giving information to police officers for five or six

24   years and that he received benefits for doing so.  RT at 682-83.  Therefore, counsel did not

25   fail to put before the jury that Mr. Schamma was an experienced jailhouse informant for

26   hire.  Petitioner cannot fault counsel for accomplishing exactly what he argues she should

27   have done.  Petitioner also speculates that the police conspired with Mr. Schamma so that

28   he would engage Petitioner in conversations about his crimes and that counsel was

                                                    19

1    ineffective for failing to investigate this conspiracy.  However, mere speculation that a

2    witness will have helpful information is insufficient for establishing a claim of ineffective

3    assistance of counsel.  See Bragg, 242 F.3d at 1087.

4            Petitioner argues that counsel should have investigated Petitioner's claim that Ms.

5    Alston's injuries could have been caused by falling from a moving vehicle.  He states that

6    the testimony of Dr. Thomas Rogers, who performed the autopsy on Ms. Alston, that there

7    were old and new injuries found on her body, supports his theory.  Traverse at 23.  During

8    counsel's cross-examination of Dr. Rogers, she asked him whether Ms. Alston's injuries

9    would be "consistent with someone jumping or falling out of a moving car."  RT at 419.

10   Dr. Rogers replied, "It's in the realm of possibility that some of these injuries are

11   consistent with an individual rolling out of a car."  RT at 419.  On re-cross, counsel asked

12   Dr. Rogers if Ms. Alston's injuries would be "like in a car accident, if your head hits the

13   back of your seat, because of the trauma, it is a potential for bruising in the front of the

14   head, or the brain?"  RT at 422.  Dr. Rogers replied, "Yes."  RT at 422.  Thus, counsel

15   brought out on cross-examination the very issue that Petitioner claims counsel should have

16   investigated.

17           Finally, Petitioner faults counsel for not investigating Monroe Oakley, the witness

18   who stated he saw Petitioner beat up Ms. Alston on the night she was found in front of the

19   hospital.  Petitioner argues that Mr. Oakley could have been impeached with inconsistent

20   statements he made at his preliminary hearing.  Traverse at 24-25.  However, when

21   counsel cross-examined Mr. Oakley she impeached him with his prior statement to the

22   police and his testimony at the preliminary hearing.  RT at 601-52.  Therefore, again,

23   counsel performed in exactly the manner Petitioner argues she should have performed.

24           Accordingly, counsel was not deficient for failing to investigate Officer Peterson,

25   Mr. Schamma, Mr. Oakley or Dr. Rogers' report.  She knew what Officer Peterson would

26   say and, thus, knew his testimony would add nothing to Petitioner's defense.  See

27   Harrington, 131 S. Ct. at 789-90; Hendricks, 70 F.3d at 1040; Eggleston, 798 F.2d at 376.

28   She effectively cross-examined Mr. Schamma so that the jury knew he was a paid

United States District Court
Northern District of California

20

informant, had a motivation to lie and thus, his credibility was put in issue.  She effectively

cross-examined Mr. Oakley so that the jury could see that he had a poor memory and had

been drinking a great deal of alcohol on the night at issue.  And, counsel obtained

testimony damaging to the prosecution from Dr. Rogers, that Ms. Alston's injuries could

have resulted from an automobile accident.  Petitioner's speculation that other witnesses

would have aided his defense, without specifying those witnesses or how their testimony

would be helpful to him, does not state a claim for ineffective assistance.  See  Bragg, 242

F.3d at 1087.  Therefore, Petitioner has failed to present a colorable claim of ineffective

assistance of counsel based on a failure to investigate.

### d. Failure to Allow Petitioner to Testify

Petitioner next argues that counsel was ineffective for failing to allow Petitioner to

testify in his own defense.  Failing to call a defendant to the stand does not constitute

ineffective assistance of counsel when defense counsel could have reasonably concluded

that the defendant's testimony would have harmed the defense because it could have

"alienated him in the eyes of the jury."  Gulbrandson v. Ryan, 711 F.3d 1026, 1038 (9th

Cir. 2013) (quoting Bell v. Cone, 535 U.S. 685, 700 (2002)).  A defendant is not

prejudiced by counsel's advice not to testify at trial where his testimony would not have

assisted his case but rather would have subjected the defendant to damning cross-

examination on prior convictions.  Matylinsky v. Budge, 577 F.3d 1083, 1097-98 (9th Cir.

2009).

Petitioner argues that counsel stated that if Petitioner testified, he would be helping

make the district attorney's case rather than his own defense.  Traverse at 12.  This

indicates that counsel made the tactical decision that if Petitioner testified, it would hurt his

case.  Counsel's decision is supported by the fact that, had Petitioner testified, substantial

impeachment material was available to the prosecution, including Petitioner's statements

to the police and his prior violent convictions.  See RT at 118 (Miranda hearing); RT at

1109-16 (Hearing on defense motion to strike priors).  Therefore, counsel's advice to

Petitioner not to testify did not constitute deficient performance nor was it prejudicial to

21

1    Petitioner.  This claim is not colorable and is denied.

2                    **e. Failure to Investigate <u>Miranda</u> Issues**

3         Finally, Petitioner argues that counsel was ineffective for failing to investigate or to

4    cite legal authority in her argument in support of her <u>Miranda</u> motion.   A review of the

5    transcript on the hearing and argument on the <u>Miranda</u> motion indicates that, although

6    counsel may not have cited legal authority, she knew the relevant facts and cogently

7    argued that Petitioner's interview with the police should be suppressed.  <u>See</u> RT at 98-118;

8    143-45; 187-88.  Further, as discussed above, the trial court's ruling that there was no

9    <u>Miranda</u> violation was not contrary to or an unreasonable application of Supreme Court

10   authority or an unreasonable determination of the facts in light of the record.  Therefore,

11   even if counsel had cited legal authority, Petitioner has not demonstrated a reasonable

12   probability that the trial court's decision would have been different.  This claim is not

13   colorable and is denied.

14                        **3. Prejudice**

15        Furthermore, Petitioner fails to meet the second <u>Strickland</u> requirement, that he was

16   prejudiced by counsel's performance.  <u>Strickland</u>, 466 U.S. at 694-95.  The prosecution's

17   case against Petitioner was strong on both charges.  In regard to the murder charge, the

18   case against Petitioner consisted of Mr. Oakley's testimony that he saw Petitioner beat Ms.

19   Alston until she was unconscious; Deputy Burke's testimony that Petitioner was standing

20   over Ms. Alston's body outside the hospital; and Mr. Schamma's testimony that Petitioner

21   admitted beating Ms. Alston.  Furthermore, the fact that Ms. Alston's blood was found in

22   Petitioner's car provided strong physical evidence pointing to Petitioner as the person who

23   beat Ms. Alston and then transported her to a grassy area outside of the hospital.  The fact

24   that Petitioner told the hospital security officer that he did not know Ms. Alston and just

25   found her body lying on the ground, when in fact Petitioner and Ms. Alston were living

26   together, is further strong evidence of his guilt.

27        In regard to the assault charge, the prosecution's case was equally strong.  It

28   consisted of the testimony of Mr. Asif that Petitioner attacked him with no provocation;

                                    22

United States District Court
Northern District of California

1   the testimony of Mr. Aubrey Hunter, the watchman at the Port of Oakland, who saw

2   Petitioner, with a closed fit, hit Mr. Asif in the face, RT at 242-45; and the testimony of

3   Dr. Albert Thomas Indresano, who performed surgery on Mr. Asif, that Mr. Asif suffered

4   four fractures to the left side of his face and that this type of severe injury usually results

5   from a large amount of force such as an automobile accident or a sports injury.  RT at 335,

6   341, 343.  Given the prosecutor's strong cases against Petitioner, even if counsel's

7   performance was deficient, there was no reasonable probability that the results of the

8   proceedings would have been different.

9         Accordingly, Petitioner's claims of ineffective assistance of trial counsel are denied.

10   **D. Ineffective Assistance of Appellate Counsel**

11         **1. Federal Law**

12         The Due Process Clause of the Fourteenth Amendment guarantees a criminal

13   defendant the effective assistance of counsel on his first appeal as of right.  Evitts v.

14   Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate

15   counsel are reviewed according to the standard set out in Strickland v. Washington, 466

16   U.S. 668 (1984).  Smith v. Robbins, 528 U.S. 259, 285 (2000); Moormann v. Ryan, 628

17   F.3d 1102, 1106 (9th Cir. 2010).  First, the petitioner must show that counsel's

18   performance was objectively unreasonable, which in the appellate context requires the

19   petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a

20   merit-worthy issue.  Smith, 528 U.S. at 285; Moormann, 628 F.3d at 1106.  Second, the

21   petitioner must show prejudice, which in this context means that the petitioner must

22   demonstrate a reasonable probability that, but for appellate counsel's failure to raise the

23   issue, the petitioner would have prevailed in his appeal.  Smith, 528 U.S. at 285-86;

24   Moormann, 628 F.3d at 1106.

25         Appellate counsel does not have a constitutional duty to raise every nonfrivolous

26   issue requested by the defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Gerlaugh

27   v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997); Miller v. Keeney, 882 F.2d 1428, 1434

28   n.10 (9th Cir. 1989).  The weeding out of weaker issues is one of the hallmarks of effective

United States District Court
Northern District of California

23

1  appellate advocacy.  Id. at 1434.  Appellate counsel therefore will frequently remain above

2  an objective standard of competence and have caused his client no prejudice for the same

3  reason--because he declined to raise a weak issue.  Id.

4        To determine whether appellate counsel's failure to raise a claim of ineffective

5  assistance of trial counsel was objectively unreasonable and prejudicial, the district court

6  must first assess the merits of the underlying claim that trial counsel provided

7  constitutionally deficient performance.  Moormann, 628 F.3d at 1106-07.  If trial counsel's

8  performance was not objectively unreasonable or did not prejudice the petitioner, then

9  appellate counsel did not act unreasonably in failing to raise a meritless claim of

10  ineffective assistance of counsel, and the petitioner was not prejudiced by appellate

11  counsel's omission.  Id.

12              **2. Analysis**

13        Petitioner argues that appellate counsel was ineffective for failing to argue on

14  appeal that: (1) the evidence was insufficient to prove that Petitioner assaulted Mr. Asif;

15  (2) the prior convictions used to enhance his sentence were unconstitutional; (3) ineffective

16  assistance of trial counsel; (4) prosecutorial misconduct based upon the prosecutor's

17  withholding evidence that law enforcement conspired with Mr. Schamma to have

18  Petitioner confess to him; and (5) prosecutorial misconduct based upon the prosecutor's

19  withholding the hospital video surveillance tape that would have shown that Petitioner did

20  not "dump" Ms. Alston's body, but was administering medical assistance to her.

21        Petitioner's first three claims regarding appellate counsel are without merit because,

22  as discussed previously, the evidence that Petitioner assaulted Mr. Asif was substantial, the

23  basis of Petitioner's argument that his prior conviction is unconstitutional is meritless, and

24  trial counsel was not ineffective.  Petitioner's last claims lack merit because, as discussed

25  below, the prosecutor did not commit misconduct.  Appellate counsel was not deficient for

26  failing to present unmeritorious arguments on appeal.  See Jones, 463 U.S. at 751-54;

27  Moormann, 628 F.3d at 1106-07.  Furthermore, Petitioner cannot show prejudice; because

28  the claims Petitioner raises are not meritorious, even if appellate counsel had presented

United States District Court
Northern District of California

24

1  them, there is no reasonable probability that Petitioner would have prevailed on his appeal.

2  **E. Prosecutorial Misconduct**

3  Petitioner contends that the prosecutor committed misconduct by:  (1) making

4  inflammatory and false comments that Petitioner was in contact with the Black Gorilla

5  [sic] Family, a prison gang; (2) presenting false evidence in order to obtain a search

6  warrant for Petitioner's family home; (3) failing to disclose the hospital's video

7  surveillance tape and Ms. Alston's clothes and possessions which would have aided

8  Petitioner's defense; (4) presenting evidence to mislead the jury; (5) presenting witnesses

9  who testified falsely; and (6) vouching for prosecution witness Mr. Oakley.

10  The first three claims were presented for the first time in Petitioner's <u>pro se</u> petition

11  to the California Supreme Court, which summarily denied them.  Therefore, this Court

12  independently reviews the record to determine if the state court's denial was contrary to or

13  an unreasonable application of Supreme Court authority.  The last three claims were

14  presented for the first time in Petitioner's traverse and, thus, are unexhausted.  The Court

15  denies them as meritless.

16  **1. Federal Law**

17  A defendant's due process rights are violated when a prosecutor's misconduct

18  renders a trial "fundamentally unfair."  <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986);

19  <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in

20  cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of

21  the prosecutor").  Factors which a court may take into account in determining whether

22  misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt,

23  <u>United States v. Young</u>, 470 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or

24  part of an ongoing pattern, <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether

25  the misconduct relates to a critical part of the case, <u>Giglio v. United States</u>, 405 U.S. 150,

26  154 (1972) ; and (4) whether a prosecutor's comment misstates or manipulates the

27  evidence, <u>Darden</u>, 477 U.S. at 182.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2. Analysis

#### a. Black Guerilla Gang Comment

Petitioner does not indicate where the prosecutor commented about the Black Guerilla Gang.  It appears that the subject came up briefly at trial when Mr. Schamma testified that Petitioner said that he had spoken to someone from the Black Guerilla Family about finding Mr. Oakley, the prosecution's witness.  RT at 674.  Mr. Schamma also confirmed that the Black Guerilla Family is a prison gang.  RT at 675.  A review of the record shows that the prosecutor did not mention the Black Guerilla Family in his closing argument.  Thus, Petitioner's argument that the prosecutor made inflammatory remarks about the Black Guerilla Family lacks any factual support and must be denied.

#### b. False Evidence for Search Warrant

Petitioner claims that police were working with Terrance Harris, a member of the Black Guerilla Family, to obtain an illegal search warrant for Petitioner's "family" home, which was not Petitioner's residence.  Traverse at 16.  Petitioner submits a copy of the warrant for the search of 1527 27th Avenue in Oakland.  Traverse, Ex. H at 1-2.  The warrant indicates that the police sergeant who signed the warrant application under penalty of perjury spoke to an individual named Terrence Harris, a friend of the victim, Ms. Alston.  Ex. H at 2.  In the warrant, the affiant attests that Mr. Harris said that he knew Ms. Alston and that she was living with Petitioner.  Mr. Harris gave their address as 1527 27th Avenue.  Ex. H. at 2.  The warrant is signed by a magistrate judge.  Ex. H. at 3.  At trial, Sergeant Rullamas testified that he served the search warrant on 1527 27th Street and seized several items that belonged to Petitioner and Ms. Alston.  RT at 840, 843, 845, 847. Sergeant Basa testified that Petitioner told him that he lived at 1527 27th Avenue with Ms. Alston.  RT at 899-90.

Although Petitioner states that the police illegally searched his "family" home instead of Petitioner's own home, he cannot deny that the items seized at 1527 27th Street with indicia that they belonged to Ms. Alston and himself, establish that he and Ms. Alston resided at that address, at least at some point in time.  The seized evidence establishes that

1   Mr. Harris did not lie to the police about Petitioner's address.  Petitioner fails to submit

2   any evidence to the contrary.  Because there is no factual support for this claim, it is

3   meritless.

4              **c. Withholding Exculpatory Evidence**

5       Petitioner claims that the prosecutor withheld the video surveillance tape from the

6   hospital that allegedly shows he rendered medical assistance to Ms. Alston and Ms.

7   Alston's clothes and possessions that allegedly would show that her injuries were sustained

8   from a car accident and not from being beaten.

9       In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the

10  suppression by the prosecution of evidence favorable to an accused upon request violates

11  due process where the evidence is material either to guilt or to punishment, irrespective of

12  the good faith or bad faith of the prosecution."  Id. at 87.  The duty to disclose such

13  evidence applies even when there has been no request by the accused, United States v.

14  Agurs, 427 U.S. 97, 107 (1976), and the duty encompasses impeachment evidence as well

15  as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985).   For a Brady

16  claim to succeed (1) the evidence at issue must be favorable to the accused, either because

17  it is exculpatory or impeaching; (2) the evidence must have been suppressed by the

18  prosecution, either willfully or inadvertently; and (3) prejudice[1] must have ensued.  Banks

19  v. Dretke, 540 U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

20      The record shows that, before the trial, the prosecutor sought to admit the hospital

21  surveillance tape in its entirety but defense counsel moved to exclude it based on its poor

22  quality and the fact that the admission of the tape presupposed that Petitioner was present.

23  RT at 150-51, 154-55 (pretrial hearing).  The court ruled that the entire tape was

24  admissible, subject to further objection during the trial.  RT at 161.  Because the prosecutor

25  did not withhold the surveillance tape, Petitioner's Brady claim based upon its alleged

26  _____

27  [1]For the purpose of Brady, the terms "material" and "prejudicial" have the same meaning.
    United States v. Kohring, 637 F.3d 895, 902 n.1 (9th Cir. 2011).

28

United States District Court
Northern District of California

1    suppression is meritless.

2           In regard to his second <u>Brady</u> claim, Petitioner presents no evidence to support his

3    allegation that the prosecution withheld Ms. Alston's clothing and possessions or that these

4    items were exculpatory.  Furthermore, Petitioner cannot establish that the exclusion of

5    these items was prejudicial.  As discussed previously, the prosecution's case against

6    Petitioner was strong.  Mr. Oakley testified that he saw Petitioner beat Ms. Alston to the

7    point of unconsciousness, at which point Petitioner picked up her unconscious body, put

8    her in his car and drove away.  RT at 570, 573, 576-77, 579-84.  Deputy Darin Burkes

9    testified that he discovered Petitioner standing over Ms. Alston's body on a grassy area

10   across the street from the emergency room of the hospital.  RT at 440-44.  Deputy Burkes

11   testified that Petitioner told him he had come out from his aunt's house to go to work and

12   saw "this lady" laying on the ground, realized she wasn't breathing, started C.P.R. and

13   yelled for help.  RT at 445.  Deputy Burkes testified that Petitioner did not tell him that he

14   knew the woman or how she got to the grassy area across from the hospital.  RT at 447.

15   Ms. Alston's blood was found in Petitioner's car and Petitioner admitted to Mr. Schamma

16   that he beat Ms. Alston and dropped her body off at the hospital.  RT at 670-73.

17   Furthermore, on re-direct, the medical expert testified that Ms. Alston's injuries were

18   consistent with being beaten.  RT at 420-22.  Given the great weight of evidence pointing

19   to Petitioner's guilt, there is no reasonable probability that disclosure of Ms. Alston's

20   clothing or possessions would have resulted in a different verdict.  Therefore, the state

21   court's denial of the previous three prosecutorial misconduct claims was not contrary to or

22   an unreasonable application of Supreme Court authority or an unreasonable determination

23   of the facts in light of the evidence.

24                       **d. Presenting Misleading Evidence**

25           Petitioner claims that the prosecutor improperly presented to the jury pictures of

26   injuries Petitioner sustained "from broken glass from a skylight on August 16, 2007,"

27   which implied that the injuries were caused by Petitioner beating the victim.  Traverse at

28   35 (citing RT at 901-06).

Petitioner cites to Sgt. Basa's testimony that he took photographs of Petitioner on August 26, 2007, approximately two weeks after Ms. Alston was found near the hospital on August 14, 2007.  Sgt. Basa testified that the photographs depicted injuries on Petitioner's hands, knuckles and forearm.  On cross-examination, Sgt. Basa admitted that he did not have any medical training and was not able to determine how or when the cuts or bruises occurred.  RT at 915.

Thus, Sgt. Basa's testimony was not untruthful and was subject to cross-examination by defense counsel who successfully had Sgt. Basa admit to the jury that he was not able to determine how or when Petitioner's cuts and bruises occurred.  The evidence was relevant to the charge of Ms. Alston's murder because Petitioner had these injuries close in time to her death.  The jury also heard testimony from Deputy Burks that he did not notice injuries on Petitioner at the time he found Ms. Alston's body outside the hospital.  RT at 445.  It was up to the jury to determine if the injuries in the photographs were connected to Ms. Alston's death.  That the prosecutor put relevant, truthful evidence before the jury does not sustain a claim of prosecutorial misconduct.  Therefore, this claim is meritless and is denied.

### e. False Testimony

Petitioner claims that the prosecutor knowingly put on witnesses—Monroe Oakley, Terrance Harris and Terry Schamma--who testified falsely.  Traverse at 35.  However, Petitioner provides no evidence to support this claim.  He merely speculates that, "all three had questionable pasts, all three had something to gain, because in all honesty, the petitioner cannot believe that these three testified and/or gave statements out of the goodness of their hearts . . . [they] gave false statements/testimony for benefit and gain."  Traverse at 35.   This claim is baseless; conclusory allegations without support by specific facts do not warrant habeas relief.  See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).

### f. Vouching for a Witness

Petitioner claims that the prosecutor improperly vouched for the credibility of prosecution witness Mr. Oakley.  Petitioner points to the prosecutor's closing argument

29

when, discussing Mr. Oakley's testimony, the prosecutor said:

> So, how did he know how to describe the defendant's car and what happened inside of it and Janet being pulled out of it if—I mean, how did he know all of her blood was going to be found in the car two days later?  Clairvoyant?  No, because he is telling the truth.  He is telling you what he saw.

RT at 1035-36.

A prosecutor may not vouch for the credibility of a witness.  United States v. Lopez, 803 F.2d 969, 973 (9th Cir. 1986).  Improper vouching for the credibility of a witness occurs when the prosecutor places the prestige of the government behind the witness or suggests that information not presented to the jury supports the witness's testimony. United States v. Young, 470 U.S. 1, 7 n.3, 11-12 (1985).  To warrant habeas relief, prosecutorial vouching must so infect the trial with unfairness as to make the resulting conviction a denial of due process.  Davis v. Woodford, 384 F.3d 628, 644 (9th Cir. 2004). Other factors for determining when reversal is required include: "the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall."  United States v. Parker, 241 F.3d 1114, 1120 (9th Cir. 2001).

The prosecutor's single statement that Mr. Oakley was telling the truth does not constitute improper vouching because the prosecutor was not placing the prestige of the government behind Mr. Oakley's testimony or suggesting that information not presented to the jury supported his testimony.  Therefore, this claim is baseless and is denied.

Accordingly, the unexhausted claims of prosecutorial misconduct are denied because it is clear that they are not colorable.

**F. Improper Consolidation of Cases**

Petitioner argues that his due process rights to a fair trial were violated when the

30

1    trial court consolidated his murder case with his assault case.

2                            **1. State Court Opinion**

3         The California Court of Appeal summarized the procedural background of this

4    claim as follows:

5         **Procedural Background**
          The Asif assault and Alston murder charges were originally filed as separate cases.
6         The prosecution moved to consolidate them for trial because both charges involved
          the same class of offense, and their joinder would not result in substantial prejudice
7         to Morrow.  Morrow opposed consolidation.  He argued that he would be
          prejudiced by consolidation because a weak case would be joined with a strong one.
8         There were more witnesses in the assault case than in the murder case, and "[t]here
          is an assumption that females are easier targets for men to assault than other males
9         are."

10

11        The court granted the motion to consolidate.  The court noted the cases were of the
12        same class of offense because they each involved violence against a person, and the
          incidents were close in time because they occurred only about a year apart. . . .
13

14        The court also did not consider one case more inflammatory than the other.  "We're
15        talking about physical beatings with fists in both situations.  One leads to very
          serious injury and surgery, hospitalization and surgery.  The other leads to
16        homicide.  So, one is not particularly inflammatory in regard to the other."  Neither
          case involved the death penalty, and the evidence in each case standing alone
17        appeared to be strong.  In the assault case, the beating occurred in front of several
          witnesses, and medical records supported the allegation that Morrow inflicted great
18        bodily injury.  In the murder case, an eyewitness observed the beating, Alston's
          blood was found in Morrow's car, and Morrow gave a false story when he dropped
19        her body off at the hospital, followed by an admission of at least partial
20        responsibility for her fatal assault from which she died.  The trial court concluded
          consolidation would not result in joining a strong case with a weak one, and it
21        would promote judicial resources and economy to try the cases together.
22

23    <u>Morrow</u>, 2010 WL 3410896, at *3-4.  The Court of Appeal denied Petitioner's due process

24    claim as follows:

25

26        Morrow also argues that consolidation of the charges for trial was so grossly unfair
27        as to violate due process.  We disagree.  The evidence on each charge amply
          supported the verdict, neither charge was significantly more inflammatory than the
28        other, neither case was significantly weaker than the other, and the jury was

                                              31

properly instructed on the elements of the offenses, the burden of proof, and to separately consider the evidence and decide each count.  FN12  (See People v. Soper, 45 Cal.4th at 783-784.)

FN12:  The jury was instructed under CALJIC No. 17.02: "Each count charges a distinct crime.  You must decide each count separately.  [¶] The defendant may be found guilty or not guilty of either or both of the crimes charged in counts one and two.  Your finding as to each count must be stated in a separate verdict."

In spite of these dynamics, Morrow contends there was "a real risk that the jury would not decide either case on the basis of the evidence because they had been offered evidence that [he] acted violently on another occasion."  He says this risk was heightened because "the jury here was never told that they could not use the evidence in one case as evidence of guilt in the other."  But there is no requirement that the court give such an instruction and it is sufficient to instruct the jury, under CALJIC No. 17.02, that each count charges a distinct crime and must be decided separately. (People v. Geier (2007) 41 Cal. 4th 555, 578-579.)  The jury was so instructed in this case.

Morrow also supports his constitutional claim by saying the prosecutor "made sure [the two crimes] were linked in the minds of the jury," but the record does not demonstrate that the prosecutor did anything improper or for a nefarious purpose. Unlike the case Morrow cites in support of this argument, the prosecutor here did not "repeatedly encourage[ ] the jury to consider the two [ ] charges in concert, as reflecting the modus operandi characteristic of [the defendant's] criminal activities." (See Bean v. Calderon (1998) 163 F.3d 1073, 1084; cf. also People v. Earle, 172 Cal. App. 4th at 409-410 [the prosecutor "mentioned the indecent exposure at every opportunity, on every conceivable pretext, and for every possible purpose," and said it was "'[p]robably the most powerful evidence'" that defendant committed a sexual assault].)  Instead, in his opening statement, the prosecutor said that at the time of the murder, Morrow was on bail for the assault on Asif. [Footnote omitted].  In closing argument the prosecutor observed that no legal justification permitted Morrow to assault Asif or to kill Alston, and that the jury should be cautious in considering defense counsel's arguments regarding Morrow's state of mind at the time of either crime.  In fact, it was defense counsel who specifically suggested that joinder could possibly effect the jury's consideration when she told the jury: "you heard these two charges, completely separate, separate victims at separate times, and I submit to you they were put together and tried in front of you together to try to sway you, to try to see that one might help you decide that another one is true."

In context, the prosecution made no argument that the evidence or existence of one

of the charges should influence disposition of the other.  Morrow has not met his "high burden" to show that the joinder of the two cases resulted in a trial that was so grossly unfair that it violated due process. (See People v. Soper, 45 Cal. 4th at 783.)

Morrow, 2010 WL 3410896, at *6-7.

### 2. Federal Authority

Joint trials conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.  Bruton v. United States, 391 U.S. 123, 134 (1968).  Improper joinder does not, in itself, violate the Constitution.  United States v. Lane, 474 U.S. 438, 446 n.8 (1986).  However, a joinder of counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997); Herd v. Kincheloe, 800 F.2d 1526, 1529 (9th Cir. 1986).

There is a "high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible."  United States v. Lewis, 787 F.2d 1318, 1322 (9th Cir. 1986).  But joinder generally does not result in prejudice if the evidence of each crime is simple and distinct (even if the evidence is not cross-admissible), and the jury is properly instructed so that it may compartmentalize the evidence.  Bean v. Calderon, 163 F.3d 1073, 1085-86 (9th Cir. 1998); see Davis v. Woodford, 384 F.3d 628, 638-39 (9th Cir. 2004) (denial of motion to sever trial of capital and noncapital charges based on separate incidents not a violation of due process because evidence was cross-admissible, the weight of evidence with respect to each incident was roughly equal, the evidence as to each incident was distinct, and the jury was properly instructed); Sandoval v. Calderon, 241 F.3d 765, 773 (9th Cir. 2000) (given the strength of the prosecution's case against petitioner on both sets of murders and the cross-admissibility of the evidence on each set, petitioner's trial was not actually prejudiced by the joinder).

A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials.  Grisby, 130

F.3d at 370.  Its inquiry is limited to the petitioner's right to a fair trial under the United

States Constitution.  Id.  To prevail, therefore, the petitioner must demonstrate that the

state court's joinder resulted in prejudice great enough to render his trial fundamentally

unfair.  Id.  In addition, the impermissible joinder must have had a substantial and injurious

effect or influence in determining the jury's verdict.  Sandoval, 241 F.3d at 772.

### 3. Analysis

The Court of Appeal correctly identified the critical question--whether Petitioner's

right to a fair trial had been prejudiced--and in order to make its determination looked to

the similar, yet distinct, nature of the evidence presented in each case, the relative strength

of each case, and whether a weak case had been joined with a strong one.  As discussed

previously, the evidence of both the assault and murder charges was compelling; therefore,

the evidence of one was not weaker than the other so that Petitioner was not prejudiced by

the spillover effect from one charge to the other.  See id.  Furthermore, the jury instruction

that each count must be decided separately cured any confusion caused by any spillover

from one charge to the other.  Review of the record confirms that the Court of Appeal's

conclusion was not based on an unreasonable determination of the facts in light of the

entire trial record.

Accordingly, the state court's rejection of Petitioner's claim was not contrary to, or

an unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1), or

based on an unreasonable determination of the facts in light of the evidence presented in

the state court proceedings, 28 U.S.C. § 2254(d)(2).

## III. Request for Evidentiary Hearing

Petitioner requests an evidentiary hearing, but fails to specify what evidence he

wishes to present.  A district court may not hold an evidentiary hearing on a claim for

which a petitioner failed to develop a factual basis in state court unless the petitioner

shows that: (1) the claim relies either on (a) a new rule of constitutional law that the

Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate

that could not have been previously discovered through the exercise of due diligence, and

1   (2) the facts underlying the claim would be sufficient to establish by clear and convincing

2   evidence that but for constitutional error, no reasonable fact finder would have found the

3   petitioner guilty of the underlying offense.  28 U.S.C. 2254(e)(2).   Where failure to

4   develop the factual basis for the claim in the state court proceedings is not attributable to

5   the petitioner, such petitioner, to receive an evidentiary hearing, must make a colorable

6   claim for relief and meet one of the factors set forth in Townsend v. Sain, 372 U.S. 293

7   (1963).  Insyxiengmay v. Morgan,  403 F.3d 657, 670-71 (9th Cir. 2005).  Specifically, in

8   Townsend, the Supreme Court concluded that a federal habeas petitioner is entitled to an

9   evidentiary hearing on his factual allegations if:  (1) the merits of the factual dispute were

10  not resolved in the state hearing; (2) the state factual determination is not fairly supported

11  by the record as a whole; (3) the fact-finding procedure employed by the state court was

12  not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly

13  discovered evidence; (5) the material facts were not adequately developed at the state-court

14  hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas

15  applicant a full and fair fact hearing.  Id. at 670 (quoting Townsend, 372 U.S. at 313).

16          Here, Petitioner has failed to make a colorable claim for relief and has failed to

17  satisfy his burden of proof under 28 U.S.C. 2254(e)(2).  Accordingly, Petitioner's request

18  for an evidentiary hearing is denied.

19  **IV.    Certificate of Appealability**

20          The federal rules governing habeas cases brought by state prisoners require a

21  district court that issues an order denying a habeas petition to either grant or deny therein a

22  certificate of appealability.  See Rules Governing § 2254 Case, Rule 11(a).

23          A judge shall grant a certificate of appealability "only if the applicant has made a

24  substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

25  certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a

26  district court has rejected the constitutional claims on the merits, the showing required to

27  satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable

28

United States District Court
Northern District of California

35

1    jurists would find the district court's assessment of the constitutional claims debatable or

2    wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

3        Here, Petitioner has not made such a showing and, accordingly, a certificate of

4    appealability is denied.

5                                    **CONCLUSION**

6        For the reasons stated above, the petition for a writ of habeas corpus is DENIED,

7    The Clerk shall enter judgment in favor of Respondent and close the file.

8        **IT IS SO ORDERED**.

9

10   Dated:  August 6, 2013

11                                                        JON S. TIGAR
                                                  United States District Judge
12

13

United States District Court
Northern District of California

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28